**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

CHERYL L. ARBAUGH,        :
                                :
        Plaintiff        :     CIVIL NO. 4:11-CV-00800
                                :
    vs.                  :     (Judge Conaboy)
                                :
MICHAEL J. ASTRUE,        :
COMMISSIONER OF SOCIAL    :
SECURITY,              :
                                :
        Defendant        :

**MEMORANDUM**

**BACKGROUND**

       The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Cheryl L. Arbaugh's claim for social security disability insurance benefits and denying in part Arbaugh's claim for supplemental security income benefits.

       Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Arbaugh met the insured status requirements of the Social Security Act through September 30, 2008. Tr. 120 and 154.[1] In order to establish entitlement to disability insurance benefits Arbaugh was required to establish that she suffered from a

---

1.  References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of his Answer on August 9, 2011.

disability on or before that date.  42 U.S.C. § 423(a)(1)(A),
(c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926
F.2d 240, 244 (3d Cir. 1990).

Supplemental security income (SSI) is a federal income
supplement program funded by general tax revenues (not social
security taxes).  It is designed to help aged, blind or other
disabled individuals who have little or no income.  Insured status
is irrelevant in determining a claimant's eligibility for
supplemental security income benefits.

Arbaugh protectively filed[2] her applications for
disability insurance and supplemental security income benefits
which are pertinent to the present action on January 21, 2008.[3]
Tr. 30, 132, 135 and 151-153.  Arbaugh's application for
disability insurance benefits was technically denied by the Bureau
of Disability Determination[4] on or about February 15, 2008,

2.  Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

3.  Arbaugh previously filed applications for disability
insurance benefits and supplemental security income benefits on
May 8, 2006.  Tr. 120. Those applications were denied by an
administrative law judge on November 19, 2007, and the Appeals
Council on September 4, 2008, concluded there was no basis to
grant Arbaugh's request for review. Tr. 120-131. Arbaugh did not
challenge that decision in this court and, consequently, the
prior decision that Arbaugh was not disable through November 19,
2007, and had the capability to engage in a limited range of
medium work is res judicata. Tr. 123 and 128.

4.  The Bureau of Disability Determination is an agency of the
(continued...)

2

although the basis for the technical denial is not clear.[5]  Tr. 132-133.  As for Arbaugh's application for supplemental security income benefits, the Bureau of Disability Determination denied that applications on April 17, 2008. Tr. 136-140.  On June 6, 2008, Arbaugh requested a hearing before an administrative law judge. Tr. 141  After about 10 months had passed, a hearing was held before an administrative law judge on April 29, 2009. Tr. 79-116.  On August 7, 2009, the administrative law judge issued a decision denying Arbaugh's application for supplemental security income benefits. Tr. 59-71.  The administrative law judge's decision did not address Arbaugh's application for disability insurance benefits. Id.  As we will explain in detail, *infra*, the administrative law judge found that Arbaugh was capable of performing a limited range of sedentary work and was not entitled to supplemental security income benefits.  Tr. 64-65.  On or about September 3, 2009, Arbaugh filed a request for review with the Appeals Council. Tr. 52-54.

On January 8, 2011, the Appeals Council notified Arbaugh that it had granted her request for review of the administrative law judge's decision and that it would consider any comments or

4.  (...continued)
state which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration.  Tr. 137.

5.  The failure of the administrative law judge to address the application for disability insurance benefits is a moot issue because as will be explained the Appeals Council addressed the application after granting Arbaugh's request for review.

new and material evidence that Arbaugh submitted within 30 days from the date of the notice. Tr. 147-150.  In that notice the Appeals Council stated that it proposed to issue a partially favorable decision finding that Arbaugh was disabled as of June 1, 2009, and entitled to supplemental security income benefits but prior to that date the Appeals Council agreed with the findings of the administrative law judge.[6] Tr. 147-148.

On February 18, 2011, the Appeals Council issued a final decision regarding Arbaugh's applications filed on January 21, 2008, for disability insurance benefits and supplemental security income benefits. Tr. 30-33. The Appeals Council also addressed a subsequent application for supplemental security income benefits filed by Arbaugh on August 28, 2009.  Tr. 31.  With respect to that subsequent application the Bureau of Disability Determination concluded that Arbaugh was disabled as of the date of the application. Id.  The Appeals Council, however, concluded that Arbaugh was disabled as of June 1, 2009,[7] and granted her

---

6.  20 C.F.R. § 404.973 states that "[w]hen the Appeals Council decides to review a case, it shall mail a notice to all parties at their last known address stating the reasons for the review and the issues to be considered." 20 C.F.R. § 404.979 states that after granting review "[t]he Appeals Council may affirm, modify or reverse the administrative law judge hearing decision" and "if the Appeals Council issues its own decision, it will base its decision on the preponderance of the evidence."

7.  The Appeals Council concluded that as of June 1, 2009, there was a substantial decrease in Arbaugh's mental functioning which precluded her from engaging in substantial gainful activity. Tr.
(continued...)

supplemental security income benefits as of that date but denied
her disability insurance benefits because the date last insured
was September 30, 2008.  In so ruling, the Appeals Council adopted
all of the findings of the administrative law judge other than his
conclusion that Arbaugh had the ability to engage in sedentary
work on and after June 1, 2009. Tr. 31.  The decision dated
February 18, 2011, of the Appeals Council is the final decision of
the Commissioner.  20 C.F.R.§ 404.981.[8]

 Arbaugh then filed a complaint in this court on April
26, 2011. Supporting and opposing briefs were submitted and the
appeal[9] became ripe for disposition on January 9, 2012, when
Arbaugh elected not to file a reply brief.

---

7.  (...continued)
44.

8.  Section 404.981 states that "[t]he Appeals Council may deny a
party's request for review or it may decide to review a case and
make a decision. The Appeals Council's decision, or the decision
of the administrative law judge if the request for review is
denied, is binding unless you or another party file an action in
Federal district court, or the decision is revised. You may file
an action in a Federal district court within 60 days after the
date you receive notice of the Appeals Council's action."

9.  Under the Local Rules of Court "[a] civil action brought to
review a decision of the Social Security Administration denying a
claim for social security disability benefits" is "adjudicated as
an appeal."  M.D.Pa. Local Rule 83.40.1.

Arbaugh, who was born in the United States on May 30, 1975,[10] completed the 11th grade and then obtained a General Equivalency Diploma.  Tr. 151 and 339.  Arbaugh can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 178 and 199.  During her elementary and secondary schooling Arbaugh attended regular education classes. Tr. 183.  After obtaining a GED Arbaugh attended college for one year. Id.

The record reveals that Arbaugh worked in 1991 and 1994 through 2005.  The jobs that she engaged in were bartender (1998 to 2000), day care worker (March, 2005 to May, 2005), direct care worker (2000 to 2003) and laborer in a factory (2004). Tr. 162.  A vocational expert described the direct care worker position as semi-skilled, medium work. Tr. 108.  He also referred to it as a mental health technician. Id.

During the years 1991 through 2005 Arbaugh's earnings were as follows:

| | |
|---|---|
| 1991 | $  228.00 |
| 1992 | 0.00 |
| 1993 | 0.00 |
| 1994 | 329.68 |
| 1995 | 3651.91 |

---

10.  At the time of the administrative hearing Arbaugh was 33 years of age and considered a "younger individual" whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. § 404.1563(c). The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

| 1996 | 1342.23 |
| 1997 | 123.49 |
| 1998 | 2642.34 |
| 1999 | 5555.21 |
| 2000 | 9278.93 |
| 2001 | 6746.68 |
| 2002 | 2458.89 |
| 2003 | 905.63 |
| 2004 | 3704.10 |
| 2005 | 773.79 |

Tr. 155.  Arbaugh's total earnings during those years were

$37,740.88.  Id.  A vocational expert testified that Arbaugh's work

never amounted to substantial gainful activity because of her low

earnings.[11] Tr. 107-108.

        Arbaugh claims that she became disabled on September 13,

2007, because of cervical, thoracic and lumbar pain, migraine

headaches, bone spurs in the neck and back, and depression. Tr.

179;  Doc. 23, Plaintiff's Brief, p. 1.  Arbaugh has not engaged

in any work since May 1, 2005. Tr. 179.

        For the reasons set forth below we will affirm the

decision of the Commissioner denying Arbaugh's application for

_____

11.  A claimant's earnings must rise to a certain level to be
considered substantial gainful work activity. "To be eligible for
disability benefits, a person must be unable to engage in
substantial gainful activity (SGA). A person who is earning more
than a certain monthly amount . . . is ordinarily considered to
be engaging in substantial gainful activity." Substantial Gainful
Activity, Automatic Determinations, Social Security Online,
http://www.ssa.gov/oact/COLA/sga.html (Last accessed August 20,
2012). In 1991 the amount was $500 per month(or $6000 per year),
in 2000 $700 per month (or $8400 per year), and in 2005 $830 per
month (or $9960 per year). Id. It does appear that Arbaugh did
engage in substantial gainful activity in 2000 because her total
earnings for that year were $9278.93.

disability insurance benefits and finding that Arbaugh was not entitled to supplemental security income benefits prior to June 1, 2009.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176

(4th Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was

accepted, which evidence was rejected, and the reasons for
rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642
F.2d at 706-707.  Therefore, a court reviewing the decision of the
Commissioner must scrutinize the record as a whole.  <u>Smith v.
Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v.
Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must
demonstrate an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).
Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in
evaluating disability insurance and supplemental security income

claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos,

474 F.3d at 91-92.  This process requires the Commissioner to

consider, in sequence, whether a claimant (1) is engaging in

substantial gainful activity,[12] (2) has an impairment that is

severe or a combination of impairments that is severe,[13] (3) has

an impairment or combination of impairments that meets or equals

---

12.  If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation
proceeds no further. Substantial gainful activity is work that
"involves doing significant and productive physical or mental
duties" and "is done (or intended) for pay or profit."  20 C.F.R.
§ 404.1510 and 20 C.F.R. § 416.910.

13.   The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. §§ 404.1520© and 416.920(c). If a
claimant has no impairment or combination of impairments which
significantly limits the claimant's physical or mental abilities
to perform basic work activities, the claimant is "not disabled"
and the evaluation process ends at step two.  Id.  If a claimant
has any severe impairments, the evaluation process continues.  20
C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all
medically determinable impairments, severe and non-severe, are
considered in the subsequent steps of the sequential evaluation
process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and
416.945(a)(2). An impairment significantly limits a claimant's
physical or mental abilities when its effect on the claimant to
perform basic work activities is more than slight or minimal.
Basic work activities include the ability to walk, stand, sit,
lift, carry, push, pull, reach, climb, crawl, and handle. 20
C.F.R. § 404.1545(b).  An individual's basic mental or non-
exertional abilities include the ability to understand, carry out
and remember simple instructions, and respond appropriately to
supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

the requirements of a listed impairment,[14] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[15]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1

---

14.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

15.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Although the relevant time period at issue in this case is from November 19, 2007, the date Arbaugh's prior applications were denied and June 1, 2009, the date the Appeals Council found Arbaugh disabled, we will commence by reviewing a medical record from February 12, 2007.  On that date based on a referral from Richard Husband, D.O., Arbaugh's primary care physician, Arbaugh was examined by Burdett Porter, M.D., a pain specialist at the Guthrie Clinic, Sayre, Pennsylvania. Tr. 243-244.  At that appointment Arbaugh complained of "[r]ight-sided neck pain and middle of back pain." Tr. 243.  Arbaugh claimed that she had pain since January, 2005, which was burning, aching, sharp and always present. Id.  She contended that she also had pain in the right arm and tingling in the middle of the right arm. Id.  She further alleged that even with pain medication the level of the pain was an 8 on a scale of 1 to 10. Id.

Dr. Porter noted that Arbaugh had an 18 year history of tobacco abuse. Tr. 244.  The results of a physical examination were essentially normal other than aggravation of pain with attempts to raise the right arm greater than 90 degrees with

13

respect to the ground and flexion, extension and rotation of the neck "seem[ed] to aggravate symptoms." Id.

Dr. Porter reviewed radiographs and stated as follows: "I have reviewed the patient's MRI that she brings with her here today as well as our x-ray of the cervical spine. Although there is some degeneration at L3-L4 and L4-L5, there does not appear to be any significant foraminal or canal stenosis.[16] It may be possible that a facet joint[17] on the right side at L3-L4 and L4-L5 may be the source of her pain. With regard to the middle back, this appears to be myofascial[18] in nature." Id.   Dr. Porter

---

16. Foraminal stenosis is the narrowing of the opening through which nerves roots exit. Canal stenosis refers to the narrowing of the canal through which the spinal cord passes.

17. "The facet joints connect the posterior elements of the [vertebrae] to one another. Like the bones that form other joints in the human body, such as the hip, knee or elbow, the articular surfaces of the facet joints are covered by a layer of smooth cartilage, surrounded by a strong capsule of ligaments, and lubricated by synovial fluid. Just like the hip and the knee, the facet joints can also become arthritic and painful, and they can be a source of back pain.  The pain and discomfort that is caused by degeneration and arthritis of this part of the spine is called facet arthropathy, which simply means a disease or abnormality of the facet joints." Facet Arthropathy, Back.com, http://www.back.com/causes-mechanical-facet.html (Last accessed August 21, 2012). The facet joints are in the back of the spine and act like hinges, There are two superior (top) and two inferior (bottom) portions to each facet joint called the superior and inferior articular processes.

18. "Myofascial" pain is muscular pain. See Dorland's Illustrated Medical Dictionary, 1223 (32nd Ed. 2012).

ordered a SPECT scan[19] of the cervical spine to evaluate for possible facet joint disease. Id.  After receiving and reviewing the results of the SPECT scan, Dr. Porter sent a letter to Dr. Husband which states in pertinent part as follows: "This study showed an essentially normal cervical spine. Based on this, I would not feel comfortable about doing further cervical spine intervention for possible facet joint disease without any positive targets by radiology." Tr. 242.

On April 10, 2007, Arbaugh was examined by Matthew D. Grier, D.O. Tr. 249-250.  Dr. Grier in the report of that examination noted that "[p]er imaging and EMG[20] there is no focal area to target in the cervical spine at present." Tr. 249.  Dr. Grier prescribed a TENS unit for the cervical paraspinals[21] and

---

19.  "A single-photon emission computerized tomography (SPECT) scan lets [a] doctor analyze the function of some of [the] internal organs. A SPECT scan is a type of nuclear imaging test, which means it uses a radioactive substance and a special camera to create 3-D pictures."  SPECT scan, Mayo Clinic staff, http://www.mayoclinic.com/health/spect-scan/MY00233 (Last accessed August 21, 2012).

20.  "Electromyography (EMG) is a test that checks the health of the muscles and the nerves that control the muscles." Electromyography, MedlinePlus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/003929.htm (Last accessed August 21, 2012).

21.  The "paraspinals" are muscles that run parallel to the spine. See Dorland's Illustrated Medical Dictionary, 1381 (32nd Ed. 2012).

encouraged Arbaugh to "begin an exercise program with daily walking." Tr. 250.

On July 17, 2007, Arbaugh had an appointment with Dr. Husband. Tr. 261.  Dr. Husband performed a physical examination of Arbaugh and found that she was alert and oriented and in no acute distress, and although Dr. Husband found some tenderness and spasm in the cervical spine, Arbaugh had normal range of motion of the cervical spine and shoulders and she was neurologically intact. Tr. 261.  Dr. Husband gave Arbaugh osteopathic manipulative treatment (OMT) and prescribed the medications Flexeril, Daypro and Omeprazole.[22]  At an appointment on August 7, 2007, Dr. Husband continued to note tenderness in Arbaugh's cervical spine and right shoulder. Tr. 260.  Dr. Husband ordered an MRI of the cervical spine. Id.

On August 15, 2007, Arbaugh had an MRI of her cervical and lumbar spine. Tr. 274.  The MRI of the lumbar spine revealed "[n]o significant abnormalities." Tr. 275.  The MRI of the cervical spine revealed "well preserved" nerve root canals at the

---

22.  Flexeril is a muscle relaxant. Flexeril, Drugs.com, http://www.drugs.com/flexeril.html (Last accessed August 21, 2012). Daypro is a nonsteroidal anti-inflammatory drug. Daypro, Drugs.com, http://www.drugs.com/mtm/daypro.html (Last accessed August 21, 2012). Omeprazol was given to counter any gastrointestinal irritation caused by the Daypro. Tr. 261; Omeprazole, Drugs.com, http://www.drugs.com/omeprazole.html (Last accessed August 21, 2012).

C4-5 level although a "somewhat prominent disc protrusion" was observed at this level and "very mild disc protrusion at the level of the disc between C3-4 and between C5-6" without any narrowing of the nerve root canals. Tr. 274.  The MRI of the cervical spine also revealed an "[u]nremarkable spinal cord." Id.

At an appointment on September 4, 2007, Dr. Husband again observed that Arbaugh had tenderness/tender points along the cervical and thoracic spine. Tr. 259.  Dr. Husband prescribed a low dose of Vicodin, a narcotic pain medication; gave Arbaugh OMT; and restarted Arbaugh on Atenolol[23] for her reported migraine headaches. Id.  He also advised Arbaugh to quit smoking. Id.

On October 16, 2007, Arbaugh was still smoking although reportedly less. Tr. 258.  Arbaugh told Dr. Husband she was "doing reasonably well with [the] migraines" and had "cut back on her pain meds." Id.  Dr. Husband gave Arbaugh OMT and continued her on the same medications although he added Prevacid for "epigastric discomfort" caused by the pain medications. Id.  Arbaugh had appointments with Dr. Husband on November 27 and December 11,

---

23.  Atenolol, known as a beta-blocker, is used to treat agina and high blood pressure.  However, it can be used to treat other conditions. Atenolol, Drugs.com, http://www.drugs.com /atenolol.html (Last accessed August 21, 2012). "Beta-blockers affect the heart and circulation (blood flow through arteries and veins." Id.

2007, and January 8, 2008.  Tr. 255-257.  No significant change in Arbaugh's condition was noted at those appointments. Id.

On January 31, 2008, Arbaugh had an MRI of the cervical as well as the lumbar spine performed at Robert Packer Hospital. Sayre, Pennsylvania. Tr. 272-273.  The MRI of the lumbar spine revealed a "[b]road base[d] disc bulge with central disc herniation at L4-5 which is causing mild spinal canal stenosis without compromise of the neural foramen." Tr. 273.  The MRI of the cervical spine revealed the following:

> No significant posterior disc disease is seen at C2-3, and C3-4 level.
>
> At C4-5 there is a broad based disc bulge with central disc protrusion identified without compromise of the spinal canal or encroachment seen of the neural foramen.
>
> At C5-6 there is left paracentral disc herniation seen which is causing encroachment on the left lateral recess without neural foraminal involvement.
>
> At C6-7 no significant posterior disc disease is seen.

Id.  It was noted that the "left paracentral disc herniation" at C5-6 was a "new finding." Id.

At an appointment on February 5, 2008, Dr. Husband although noting "diffuse tenderness" at C5-C7 levels of the cervical spine found that Arbaugh had full range of motion of the cervical spine, normal reflexes in the upper extremities and no obvious muscle weakness. Tr. 254.

18

On February 12, 2008, Arbaugh had x-rays (3 views) of the thoracic spine performed at Troy Community Hospital. Tr. 271. The x-rays were reported to be "normal" and Arbaugh was advised to treat her "backache" with moist heat. Id.

Arbaugh had appointments with Dr. Husband on March 4 and 17, 2008. Tr. 252, 302 and 304-305. At the appointment on March 4th Arbaugh complained of cervical pain radiating down her left arm but her pain level was reasonably controlled with medications. Tr. 252. She also complained of flu-like symptoms. Id. The results of a physical examination were essentially normal other than symptoms associated with a respiratory infection and tenderness along the cervical spine with decreased range of motion. Id. Arbaugh had normal reflexes in the upper extremities. Id. At the appointment on March 17th Arbaugh had mild tenderness in the lower back, a negative straight leg raise test[24] and normal reflexes. Tr. 305.

On March 12, 2008, Arbaugh had an appointment with Erik M. Gregorie, M.D., a neurosurgeon, at the Guthrie Clinic in Sayre,

---

24.  The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc. The patient, either lying or sitting with the knee straight, has his or her leg lifted. The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed August 21, 2012).

Pennsylvania. Tr. 277-278.   Arbaugh told Dr. Gregorie that "her main discomfort" was "neck pain" since 2005 and that she "gets occasional pain involving the right shoulder with radiation of pain to the right side of her neck" and "[t]he only radicular pain she has is on the left and radiates down the left arm into the hand."  Tr. 277.  She stated that the only area of "numbness" was in the left thumb. Id.   A physical examination of Arbaugh revealed that she was in no acute distress; she had intact peripheral pulses; she had a normal station and gait; she had normal muscle strength and tone in both arms and legs; she was oriented to time, place and person with normal memory and language function; she was neurologically intact; her reflexes were essentially normal; her sensation was intact to light touch with one exception of "a subjective decrement in the C6 dermatone."[25] Tr. 277-278.

Dr. Gregorie reviewed the results of Arbaugh's MRI scans and found that the MRI of the lumbar spine was "within normal limits "with the exception of a central disk protrusion at the L4-

───────────────

25.  A dermatone is an area of the skin mainly supplied by a single spinal nerve. There are 8 such cervical nerves, 12 thoracic, 5 lumbar and 5 sacral. A problem with a particular nerve root should correspond with a sensory defect, muscle weakness, etc., at the appropriate dermatone. See Stephen Kishner, M.D., Dermatones Anatomy, Medscape Reference, http://emedicine.medscape.com/article/1878388-overview (Last accessed August 21, 2012).

L5 level" which did "not result in significant lateral recess stenosis" and evidenced a "patent"[26] neural foramina. Tr. 278. Dr. Gregorie found that the MRI of the cervical spine revealed that the "disks and neural foramina are well preserved with the exception of C5-6" where there appeared to be "a left-sided C5-C6 disk protrusion." Id.  Dr. Gregorie told Arbaugh that "prior to considering surgery" he would like to "maximize conservative measures" such as "intermittent cervical traction" and he asked Arbaugh to follow-up with Dr. Husband. Id.

On April 1 and April 15, 2008, Arbaugh had appointment with Dr. Husband.  Tr. 307-310. The notes of these appointment reveal no significant change in Arbaugh's condition.  Id.

On April 17, 2008, Paul Taren, Ph.D., a state agency psychologist, reviewed Arbaugh's medical records and concluded that Arbaugh did not suffer from any severe mental impairment and that Arbaugh only had mild functional limitations with respect to concentration, persistence or pace. Tr. 286-298.

At an appointment with Dr. Husband on April 29, 2008, Arbaugh stated that she was "[f]eeling a little bit better" and having "less pain."  Tr. 312.  A physical examination of Arbaugh

---

26.  Patent is defined as "open, unobstructed, or not closed." Dorland's Illustrated Medical Dictionary, 1395 (32nd  Ed. 2012).

revealed "diffuse tenderness" along the cervical and thoracic spine. Id.  Dr. Husband prescribed pain medications. Id.

On June 2, 2008, Dr. Husband wrote a letter to Arbaugh's attorney which states in relevant part as follows:

> I have reviewed MRI reports of 1/31/08 concerning Cherly Arbaugh's chronic neck pain and back pain condition.  I believe that her complaints of chronic cervical spine pain are explained on the results of the MRI.  That is, C5-C6 disc herniation on the left, would be significant enough to cause ongoing pain and stiffness in her cervical spine with radiation to the left shoulder and arm. Regarding her lumbar spine MRI, I do not believe that there is any significant findings here that would cause pain.  A bulging disc at L4-L5 without any nerve root compression would not cause any chronic back pain.  As you know, bulging discs are commonly found in people who are totally asymptomatic.  Therefore, I believe that Cheryl's low back pain is primarily a mechanical low back issue such as a chronic strain and sprain from poor muscular conditioning, or any other cause that you may want to attribute it to.
>
> In conclusion, I believe that Cheryl does have a very legitimate problem with her cervical spine, for which she is receiving ongoing treatment.  Her low back condition is probably not severe enough to pursue disability, as it does not meet medical criteria that are set forth by the social security people.[27]

---

27.  Dr. Husband's opinion as noted by the administrative law judge (Tr. 67-68) appears somewhat inconsistent. Dr. Husband states that a bulging disc in the lumbar spine without nerve root compression would not cause any pain but then states that the disc herniation at the C5-C6 level of the cervical spine would cause pain. However, the MRIs of the cervical spine did not reveal any compromise of the neural foramen through which the nerve roots pass. Dr. Husband may have an explanation for this inconsistency but none is apparent from our review of the record.

Tr. 299.  Dr. Husband in the letter did not specify Arbaugh's work-related functional abilities such as lifting, carrying, standing, walking and sitting.[28] Id.

Arbaugh had four additional appointments with Dr. Husband prior to her date last insured of September 30, 2008. Those appointment were on June 16, July 16, August 27 and September 24th. Tr. 314-320.  The treatment notes of those appointments reveal no significant worsening or improvement of Arbaugh's condition.[29] Id.

On September 15, 2008, Arbaugh had radiographs of her cervical spine conducted at Troy Community Hospital. Tr. 300. Those radiographs revealed no "evidence of central canal stenosis or foraminal encroachment." Id.

On September 9, 2008, Arbaugh admitted herself to the Robert Packer Hospital Behavioral Science Unit with complaints of

---

28.  Notably, Dr. Husband never specified Arbaugh's work-related functional abilities.

29.  At the appointment on June 16th Arbaugh admitted "the same level of pain, maybe a little bit better." Tr. 314. On July 16th Arbaugh complained of migraine headaches occurring 1-2 times per week but there was no objective medical evidence that her condition had deteriorated. Tr. 316. At the appointment on August 27th Arbaugh suffered from an acute respiratory infection and it was noted that Arbaugh engaged in the chronic abuse of tobacco. Tr. 318. At the appointment on September 24, 2008, Arbaugh's pain level was "about the same." Tr. 320. The notes of that appointment also reveal that a recent blood test was positive for the use of marijuana. Id.

depression and panic attacks. Tr. 327.  Arbaugh was discharged

from the Robert Packer Hospital on September 15, 2008, with a

diagnosis of major depressive disorder, panic disorder, and

marijuana abuse and given a Global Assessment of Functioning (GAF)

score of 55.[30] Tr. 338

---

30.  The GAF score allows a clinician to indicate his judgment of
a person's overall psychological, social and occupational
functioning, in order to assess the person's mental health
illness.  *Diagnostic and Statistical Manual of Mental Disorders*
3-32 (4th ed. 1994). A GAF score is set within a particular range
if either the symptom severity or the level of functioning falls
within that range. Id. The score is useful in planning treatment
and predicting outcomes. Id.  The GAF rating is the single value
that best reflects the individual's overall functioning at the
time of examination.  The rating, however, has two components:
(1) symptom severity and (2) social and occupational functioning.
The GAF is within a particular range if either the symptom
severity or the social and occupational level of functioning
falls within that range.  When the individual's symptom severity
and functioning level are discordant, the GAF rating reflects the
worse of the two.  Thus, a suicidal patient who is gainfully
employed would have a GAF rating below 20.  A GAF score of 21-30
represents behavior considerably influenced by delusions or
hallucinations or serious impairment in communication or judgment
or inability to function in almost all areas.  A GAF score of 31-
40 represents some impairment in reality testing or communication
or major impairment in several areas,  such as work or school,
family relations, judgment, thinking or mood. Id.  A GAF score of
41-50 indicates serious symptoms or any serious impairment in
social, occupational or school functioning.  Id.  A GAF score of
51 to 60 represents moderate symptoms or any moderate difficulty
in social, occupational, or school functioning. Id. A GAF score
of 61 to 70 represents some mild symptoms or some difficulty in
social, occupational, or school functioning, but generally
functioning pretty well with some meaningful interpersonal
relationships. Id.  A GAF score of 71 to 80 represents transient
symptoms, if present, and expectable reactions to psychosocial
stressors or no more than slight impairment in social,
occupational, or school functioning.  Id.

On September 18, 2008, Arbaugh began treating at Northern Tier Counseling Center with Alan Douglas, M.A., a psychologist. Tr. 327-331.  The initial diagnosis was major depressive disorder and panic disorder with agoraphobia and Arbaugh was given a GAF score of 50. Tr. 327.  The results of a mental status examination were essentially normal other than Arbaugh had a depressed mood and a constricted affect. Tr. 328. Arbaugh'a appearance was neat, her attention was good, and her judgment, memory, and thought processes were intact. Id.   Arbaugh agreed to commence treatment at Northern Tier Counseling. Tr. 331.

Over the next several months Arbaugh was periodically evaluated at Northern Tier Counseling. Tr. 338-341, 348-349 and 355-356.  The records of Northern Tier Counseling reveal that on December 17, 2008, Arbaugh was given a GAF score of 52. Tr. 338. A mental status examination on that date was essentially normal other than Arbaugh had a depressed mood. Id.  On January 16, 2009, Arbaugh was given a GAF score of 50 although this score was noted on a Treatment Plan and not an evaluation form. Tr. 349.   On January 29, 2009, Arbaugh was evaluated by Lucille E. Venturanza, M.D., a psychiatrist, at Northern Tier. Tr. 339-341.  Dr. Venturanza diagnosed Arbaugh as suffering from major depressive disorder, panic disorder by history and polysubstance abuse which included the abuse of alcohol and marijuana by history. Tr. 341.

25

Dr. Venturanza gave Arbaugh a GAF score of 55, representing moderate symptoms. Id.  On April 28, June 19, and July 15, 2009, Arbaugh was given a GAF score of 55. Tr. 355-357.

On October 24, November 21 and December 19, 2008, Arbaugh had appointments with Dr. Husband. Tr. 321-326.  The treatment notes of those appointments reveal no significant worsening or improvement of Arbaugh's condition. Id.  On December 19, 2008, Arbaugh denied any arm pain, numbness, paresthesias (a prickling or pins and needles sensation) or weakness. Tr. 326.

On October 13, 2009, more than two months after the administrative law judge's decision, Arbaugh submitted a letter from Dr. Husband. Tr. 361.  In that letter, Dr. Husband stated that the administrative law judge did not properly consider the MRI evidence showing that Arbaugh had a herniated disc in her neck. Id.  Dr. Husband concluded that the objective evidence supported Arbaugh's use of medication and other pain management modalities but did not specify an work-related functional limitations. Id.

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Arbaugh had not engaged in substantial gainful work activity since January 21, 2008, the

26

date of Arbaugh's application for supplemental security income benefits. Tr. 61.

At step two of the sequential evaluation process, the administrative law judge found that Arbaugh had the following severe impairments: chronic cervical, thoracic and lumbar pain and depression.  Id.  The administrative law judge found that Arbaugh's headaches and alleged radicular symptoms in the upper extremities were non-severe impairments because there was no evidence that they caused work-related functional limitations. Tr. 62.

At step three of the sequential evaluation process the administrative law judge found that Arbaugh's impairments did not individually or in combination meet or equal a listed impairment. Tr. 62-64.  In so finding the administrative law judge reviewed in his decision the listings and the objective evidence of Arbaugh's physical and mental impairments and considered the opinion of the state agency psychologist in finding that Arbaugh's impairments did not meet or equal a listed impairment.  The administrative law judge explained in detail his basis for his step three finding.

At step four of the sequential evaluation process the administrative law judge found that Arbaugh had no past relevant work in light of her limited earnings but had the residual functional capacity to perform a limited range of unskilled,

sedentary work. Tr. 64-65 and 111.  The administrative law judge
imposed several limitations regarding the type of sedentary work,
including the work could not require continuous or repetitive
rotation, flexion or extension of the neck and the claimant had to
have an opportunity to relax the positioning of the neck from time
to time.  Id.  The work would have to be of a "relatively simple
nature, not complex, not involving processing of complex
instruction and the like" and "performed within a specific, stable
environment, not subject to changes in the work environment more
than occasionally." Id.

In arriving at this residual functional capacity the
administrative law judge found that Arbaugh's statements about her
pain and functional limitations were not credible. Tr. 21-22.
Specifically, the administrative law judge stated as follows:

> [D]espite her complaints, claimant's testimony indicates
> that she is able to conduct her activities of daily
> living and can care for her two (2) children, ages
> twelve (12) and seventeen (17) (Hearing Testimony). She
> is able to go for walks with her daughter, shop for
> groceries and perform household chores. She spends time
> with her family watching television or going to the
> movies and reading newspapers, magazines and books
> (Hearing Testimony).  She is able to get around using
> public transportation and can walk approximately five
> (5) blocks to perform activities such as pay her bills
> . . . .
>
> In the matter presently at bar, in her own words,
> claimant's subjective complaints of pain make things
> such as her daily chores and cooking for her children
> "difficult" . . . However, . . . "difficult" is not the
> standard employed . . . for the award of disability

28

> benefits. . .  The overwhelming evidence of record,
> including the claimant's own testimony, establishes that
> she can perform activities on a daily basis, albeit with
> some subjective level of pain and perceived limitations.
> . . .

Tr. 69.  The administrative law judge went on to find that
Arbaugh's "statements concerning the intensity, persistence and
limiting effects of her symptoms were not credible to the extent
that they precluded her from engaging in the a very limited range
of unskilled, sedentary work. Id.

The administrative law judge also reviewed the medical
evidence and noted that "[t]he objective medical evidence of
record reveals that claimant does not suffer from disabling spinal
conditions" and the "treatment to date has been conservative,
consisting of physical therapy, pain management, epidural
injections, heat packs and osteopathic/chiropractic therapy
including spinal manipulation." Tr. 66.  The administrative law
judge also noted the prior decision by an administrative law judge
(who found that Arbaugh could perform medium work at least as of
November 17, 2007), and observed that there really was no
significant deterioration in Arbaugh's condition since the prior
decision.  Tr. 67-68.  He further noted that none of Arbaugh's
treating physicians have indicated that she is a surgical
candidate. Id.

At step five, the administrative law judge based on a residual functional capacity of a limited range of unskilled, sedentary work as described above and the testimony of a vocational expert found that Arbaugh had the ability to perform unskilled work as a visual inspector, assembler, and surveillance system monitor, and that there were a significant number of such jobs in the regional and state economies. Tr. 71.

The administrative record in this case is 361 pages in length and we have thoroughly reviewed that record.  The administrative law judge did an excellent job of reviewing Arbaugh's medical history and vocational background in his decision. Tr. 59-71.  Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 24, Brief of Defendant.  Arbaugh argues that the administrative law judge erred by failing to (1) properly consider and explain why he was rejecting treating source testimony of Dr. Husband[31] and (2) perform his affirmative obligation to assist Arbaugh in developing the record.  We find no merit whatsoever in Arbaugh's arguments.

The Social Security regulations require that an applicant for disability insurance or supplemental security income

---

31.  Dr. Husband did not testify at the administrative hearing. The reference to testimony is erroneous.

benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. § 404.1512(c). Arbaugh failed to provide such evidence. No treating or examining physician or psychiatrist provided a statement indicating that Arbaugh prior to June 1, 2009, had functional limitations for the requisite continuous 12 month period[32] that would prevent her from engaging in the limited range of unskilled, sedentary work set by the administrative law judge. Furthermore, the medical evidence prior to June 1, 2009, does not show a significant change in Arbaugh's physical or mental condition since the prior decision of November 19, 2007 (finding Arbaugh capable of medium work), which would preclude Arbaugh from engaging in unskilled, sedentary work.

As for Arbaugh's claim that the administrative law judge failed to appropriately develop the record, Arbaugh has not submitted or proffered any evidence which suggests that prior to

---

32. As stated earlier in this memorandum to receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).

June 1, 2009, she had work-related functional limitations which would have precluded her from engaging in the limited range of unskilled, sedentary work set by the administrative law judge.[33]

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

Dated: August 22, 2012

---

33.  Arbaugh also argues that the administrative law judge exhibited bias against her at the administrative hearing by rushing the questioning of her attorney.  We discern no evidence of bias in the record. Furthermore, counsel during the administrative hearing did not interpose any objections to the administrative law judge's demeanor and manner of conducting the hearing.